**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**DAVID RUBIN,**

                    *Plaintiff*,

          -against-

**HSBC BANK USA, NA, EQUIFAX**
**INFORMATION SERVICES LLC, and**
**EXPERIAN INFORMATION SOLUTIONS,**
**INC.,**

                    *Defendants*.

**1:20-cv-04566-FB-SJB**

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION FOR**
**ATTORNEYS' FEES, COSTS AND**
**EXPENSES**


Date of Service: Friday, June 21, 2024

Adam G. Singer
Richard Kraus
**LAW OFFICE OF ADAM G. SINGER, PLLC**
One Grand Central Place
60 E. 42nd Street, Suite 4600
New York, NY 10165
212.842.2428

Kevin Mallon
**MALLON CONSUMER LAW GROUP, PLLC**
165 Broadway, 23rd Floor
New York, NY 10006
917.734.6815

Robert S. Sola
**ROBERT S. SOLA, P.C.**
1500 SW First Avenue, Suite 800
Portland, OR 97201
503.295.6880

1

# Table of Contents

I.     INTRODUCTION ................................................................................................ 4

II.    CASE PROCEDURAL HISTORY ..................................................................... 5

   A.    Written Discovery and Mediation.................................................................... 6

   B.    Plaintiff's Efforts to Take Depositions and Need to File Motion to Compel ............... 7

   C.    HSBC's Depositions ....................................................................................... 9

   D.    Third-Party Subpoenas.................................................................................. 10

   E.    HSBC's Motions to Seal: "borderline frivolous" and "utterly meritless" ........................ 10

   F.    Motion for Summary Judgment .................................................................... 11

   G.    Settlement Negotiations ................................................................................ 11

III.   ARGUMENT .................................................................................................... 13

   A.    Plaintiff is Entitled to Costs and Attorney's Fees ......................................... 13

   B.    Public Policy Supports the Award of Attorney's Fees .................................. 13

   C.    Plaintiff's Fee Request is Reasonable ........................................................... 15

      1.    The Hourly Rates Requested by Plaintiff are Reasonable ........................... 15

      2.    The Hours Expended by Plaintiff's Counsel were Entirely Reasonable and Necessary for the Prosecution of this Action ........................................................... 21

IV.    CONCLUSION.................................................................................................. 23

# Table of Authorities

**Cases**

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79-80 (6th Cir. 1982) ............................................................ 13

*City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) ............................................................... 14

*Farbotko v. Clinton Cty. Of New York*, F.3d 204, 2011 (2d Cir 2005) ....................................... 15

*Fleet Inv. Co. v. Rogers*, 620 F.2d 792 (10th Cir 1980) .............................................................. 14

*Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ......................................................................... 14

*Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) ........................................ 16

*Lilly v. City of New York*, 934 F.3d 222, 230 (2d Cir. 2019) ....................................................... 14

*Mader v. Experian Information Solutions, Inc.*, 56 F.4th 264 (2d Cir. 2023) ............................. 16

*McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006) ...................................................................................................................... 14

*Sessa v. Trans Union, LLC*, 74 F.4th. 38 (2nd Cir. 2023) ........................................................... 17

*Student Public Interest Research Group of New Jersey v. AT&T Bell Laboratories*, 842 F.2d 1436, 1449 (3d Cir. 1988) .......................................................................................................... 13

**Statutes**

15 U.S.C. § 1681n(a)(3) ................................................................................................................. 13

15 U.S.C. § 1681o(a)(2) ................................................................................................................. 13

**Rules**

Fed. R. Civ. Pro. 30(b)(6) ................................................................................................................ 7

Fed. R. Civ. Pro. 30 ......................................................................................................................... 7

Fed. R. Civ. Pro. 45 ......................................................................................................................... 7

**Treatises**

Posner, *Economic Analysis of Law*, 534, 567 (4th ed. 1992) ....................................................... 18

## I.    INTRODUCTION

Plaintiff's Motion for an Award of Attorneys' Fees, Costs and Expenses follows over three years of litigation in which Plaintiff prevailed and obtained a judgment in the amount of $250,000 plus attorney fees and costs along with an agreement to cease collection of the disputed debt and remove the debt from Plaintiff's credit reports.  The Judgment resulted from an offer of judgment made by defendant HSBC shortly before trial.  That *second* offer of judgment also follows over three years of HSBC's insistence that Plaintiff incurred the debt, that HSBC did nothing wrong, and that Plaintiff did not suffer any damages.  Plaintiff seeks an award of attorneys' fees in the amount of $728,998 ($533,796 for the Law Offices of Adam G. Singer, $163,089 for Mallon Consumer Law Group, and $32,113 for the Law Offices or Robert S. Sola), taxable costs in the amount of $5,565 and non-taxable expenses in the amount of $15,450.[1]

The amount of fees sought by Plaintiff is a direct result of the "Stalingrad" defense that Defendant asserted in this case.  Defendant fought Plaintiff at every turn and refused to respond to Plaintiff's settlement attempts on multiple occasions.  It rejected a reasonable last-ditch effort from Plaintiff to resolve the case before fees and costs were to escalate dramatically and instead chose to file several meritless motions and forced Plaintiff to seek Court intervention to even produce its witnesses for deposition.  Thus, Defendant is wholly responsible for the fees incurred by Plaintiff in this action.

In support of this Motion, Plaintiff submits the Declarations of Plaintiff's counsel Adam Singer (and others at his firm), Kevin Mallon and Robert Sola, including exhibits detailing or otherwise supporting the time and fees expended in the prosecution of this case, along with the

---

[1] Plaintiff is not seeking compensation for the significant time preparing this Motion since the HSBC's Rule 68 Offer expressly provides that fees were cut off after the date of the offer.

Declaration of John O'Connor, an expert on attorney fees.

Based upon the Memorandum of Law and exhibits in support thereof, Plaintiff should be awarded the full amount of the reasonable attorneys' fees, costs and expenses sought. The total attorneys' fees sought by Plaintiff represents the lodestar of Plaintiff's counsel, based upon the time reasonably expended and hourly rates which are at or below the current market rate for legal services in the Eastern and Southern District of New York markets.

## II.    CASE PROCEDURAL HISTORY

This Fair Credit Reporting Act ("FCRA") cases arises from Defendant's false reporting regarding Plaintiff to the credit reporting agencies and its refusal to correct that false reporting despite Plaintiff's numerous disputes to Defendant. Plaintiff is a victim of identity theft. An identity thief stole his HSBC credit card before he ever received it and used it to run up a charge of $1,850.85 at BJ's Wholesale, Inc. and an additional failed attempted to make charges at a nearby Target. HSBC, realizing that this activity was indicative of fraud, blocked the used of the card at Target and sent a fraud alert to Plaintiff. Plaintiff immediately notified HSBC that he had never received the card and had not made the BJ's charge or attempted to make the Target charge. HSBC responded on October 18 that it would cancel the card. HSBC sent Plaintiff a card statement for the period October 4 to November 3, 2019, crediting Plaintiff $1850.85. *See* Singer Decl. ¶ 23.

Subsequently, however, HSBC denied Plaintiff's fraud claim and began reporting the fraudulent $1850.85 in charges to the credit reporting agencies. Plaintiff disputed the false charge with HSBC and reported the identity theft to the police and to the Postal Service. He also disputed the false account with the credit reporting agencies, who informed HSBC of the disputes. But HSBC failed to investigate those disputes as required by the FCRA and at all times

5

refused to remove the fraud account from Plaintiff's credit reports.  HSBC eventually began

harassing Plaintiff with its extensive collection efforts to collect the fraudulent debt.  *See* Singer

Decl. ¶ 24.

### A. Written Discovery and Mediation

Plaintiff filed the instant suit on September 25, 2020.  HSBC failed to file a timely

response and Magistrate Judge Bulsara ordered HSBC to show cause as to why a default

judgment should not be entered.  Dkt. Order Oct. 28, 2020.  Written discovery commenced after

all parties were joined, with the parties (other than HSBC) producing nearly 700 pages of

documents, multiple lengthy spreadsheets, and multiple audio recordings, in addition to

interrogatory responses and responses to requests for admission.  *See* Singer Decl. ¶¶ 26–28.

Following a status conference on June 10, the Court referred the case to mediation.

HSBC's co-defendants settled quickly.  But settlement negotiations with HSBC were hampered

because HSBC would not produce any documents or other discovery, even informally, until July

30, 2021.  *See* Singer Decl. ¶ 28.

Plaintiff served HSBC with Plaintiff's first set of document requests and interrogatories;

and a notice of deposition under Fed. R. Civ. Pro. 30(b)(6) as well as two notices of deposition

under Rule 30(b)(1).  On July 30, HSBC produced a mere 54 pages of documents informally.

Yet it refused to produce any ACDVs, the main record of its communications with the credit

bureaus about Plaintiff's disputes and the most essential document needed by Plaintiff to prove

his FCRA claim.  HSBC also failed to provide copies of its policies and procedures for

investigating disputes, forcing Plaintiff to spend time meeting and conferring with Defendant

about these withheld documents.  *See* Singer Decl. ¶¶ 29–30.

**B. Plaintiff's Efforts to Take Depositions and Need to File Motion to Compel**

HSBC initially produced two witnesses: HSBC's corporate representative Nancy Taylor, HSBC's fraud investigator George Mossios. Those two witnesses were unable to answer several basic questions about the nature of HSBC's investigations of Plaintiff's dispute. Plaintiff thus had to serve an additional notice of deposition on HSBC pursuant to Fed. R. Civ. Pro. 30(b)(6), on August 24, 2021. *See* Singer Decl. ¶ 34.

Plaintiff also served a deposition notice for HSBC employee, Brian DeFontes, who had been HSBC's senior manager of contact flow and, in that capacity, had been responsible for HSBC's Interactive Voice Response system. Both depositions were initially scheduled for December 7, 2021, and the second Rule 30(b)(6) deposition also contained a request to meet and confer about the deposition topics. Despite the requirement for conferral on deposition topics in Rule 30(b)(6), Defendant refused to confer with Plaintiff about the deposition topics, or even let Plaintiff know if they intended to actually produce any witnesses, despite repeated requests by Plaintiff. Even though the notices were served on November 22, 2012, Defendant waited until 10:36 pm on the night before the depositions were scheduled to go forward to serve objections and to notify Plaintiff that it would not be producing any witnesses on the following day. *See* Singer Decl. ¶ 37.

Plaintiff was thus forced to file what should have been a completely unnecessary motion to compel production of the relevant witnesses. That motion, made to Magistrate Bulsara on December 9, 2021, details the extent to which Defendant "sought to obstruct discovery from the outset of the case" with "tactical obstruction" and "uncooperative tactics reminiscent of its conduct throughout much of the case," Dkt. 47. Defendant argued that it was not obligated to

produce a certain employee, Brian Defontes, pursuant to FRCP 30 because he was not a

"managing agent," thus forcing Plaintiff to locate and subpoena the witness pursuant to FRCP

45. When Plaintiff served the witness with the subpoena at his home address, Defendant emailed

Plaintiff to complain that this "was not well received by either him [DeFontes] or our in-house

legal contact who now is having us represent Mr. DeFontes. Please direct all future

communications regarding Mr. DeFontes to us." *See* Singer Decl. ¶ 38. This conduct was

perfectly emblematic of how Defendant handled this case—refusing to produce a witness by

consent, then admonishing Plaintiff for subpoenaing the witness only to then agree they would

be representing the witness after all. This conduct was done for purely obstructionist purposes

and, to put it mildly, was not well received by Magistrate Bulsara.

> [Y]our [counsel for HSBC's] insistence of the Rule 45 subpoena process as opposed to the deposition notice process is just obstruction, okay? If he's [DeFontes] is an [HSBC] employee who you're going to represent, your colleague's letter opposing the deposition on that technical ground is something I've never heard of from a law firm representing a corporation and individual employees, okay? I will tell you, it's unbecoming and I'm not pleased to see that kind of behavior at all….
>
> Okay, Mr. Frontino [counsel for HSBC], you mistake common sense and decency and obstruction. You've engaged in the latter at the expense of the former…. So your behavior here is frankly uncooperative to say the least…. It's unprofessional and unbecoming….[2]

Plaintiff also deposed HSBC's two expert witnesses, Lance Watson and John Ulzheimer.

All of Plaintiff's depositions were necessary in successfully opposing HSBC's motion for

summary judgment. *See* Singer Decl. ¶ 39.

---

[2] See Singer Decl. ¶ 38.

### C.  HSBC's Depositions

HSBC conducted six depositions, all of which were defended by Plaintiff's counsel: Plaintiff, his wife Heske Van Doornen, his friend Greg Kessler, his mother Christina Rubin, his father Allen Rubin, and his physician, Dr. Prin Amorapanth.  *See* Singer Decl. ¶ 40.

Two of those witnesses had absolutely no information relevant to Plaintiff's claims, but Defendant insisted on deposing them, even requesting a sixty-day discovery extension (Doc. 48) to do so.  First, Defendant insisted on deposing Plaintiff's physician, Dr. Prin Amorapanth, even though Plaintiff had already notified Defendant that he would only be seeking "garden variety" emotional distress damages and, as such, medical evidence would not be material, and that Plaintiff would not be calling his physician or another medical expert.  Defendant's counsel stated that if Plaintiff stipulated that he "will not claim he is seeing a mental health or other medical professional for any alleged emotional distress damages, we will confer with our client about foregoing this discovery."[3]  Plaintiff agreed to the proposed stipulation, but HSBC insisted on deposing Dr. Amorapanth anyway.  The ensuing deposition stretched over *three sessions*, May 23, June 14, and June 20, 2022, and revealed no information relevant to Plaintiff's claims. *See* Singer Decl. ¶ 41.

Second, HSBC insisted on deposing Plaintiff's father, Allen Rubin, although Plaintiff had notified HSBC that Allen Rubin was an elderly man in mental decline whom Plaintiff would not call.  Nevertheless, HSBC insisted on deposing him on March 30, 2022.  Plaintiff's counsel had to prepare for and defend this unnecessary deposition.  *See* Singer Decl. ¶ 42.

---

[3] Email from Brian Frontino, counsel for HSBC, to Adam Singer, counsel for Plaintiff, Jan. 31, 2022, 11:07 am.

### D. Third-Party Subpoenas

Plaintiff served subpoenas on American Express, Blue Ridge Bank, Capital One, Chase Bank, Cross River Bank, Data Facts, Farm Credit East, Finwise, LendingPoint, Marlette, and the Small Business Administration in order to prove the harm Plaintiff suffered as a result of Defendant's unlawful conduct. None of these institutions responded promptly, forcing Plaintiff to follow up, at length, with these institutions by calling and emailing their respective in-house legal departments or subpoena compliance departments. *See* Singer Decl. ¶ 44.

### E. HSBC's Motions to Seal: "borderline frivolous" and "utterly meritless"

In conjunction with its summary judgment motion, HSBC also filed two borderline frivolous motions to seal certain documents. The Court on January 4, 2023, rejected HSBC's motion to seal, finding it "substantially meritless," but allowed HSBC to file an amended motion to seal. This second motion was also rejected by the Court, finding that "HSBC filed a motion that failed to even address the Court's prior order, which is even more unfortunate," and that "the Court's [prior] order point this out and HSBC simply ignored it." The Court further stated that HSBC's decision "to file basically the same motion and ignore the Court's order is a grave concern." The Court also pointed out that HSBC had failed to narrowly tailor its request to seal, holding that HSBC's request was not "supported by any case law, particularly the Second Circuit's most recent case law." In dealing with specific examples of what HSBC sought to seal, the Court said that HSBC's request "frankly, boggles the mind," that "[n]o case law supports such sealing," and that "it's just laughable to assert that they're entitled to sealing." The Court asserted out that "neither of those authorities" cited by HSBC in support of its motion were

"remotely relevant."  The Court summarized HSBC's motion as "borderline frivolous" and "utterly meritless" and ordered all the relevant documents unsealed.  *See* Singer Decl. ¶ 45.

### F. Motion for Summary Judgment

On December 21, 2022, HSBC filed a letter-motion requesting a pre-motion conference for a motion for summary judgment (Doc. 61), along with an accompanying statement of material facts (Doc. 62), and a motion for leave to file documents relevant to its motion under seal (Doc. 63).  Plaintiff responded to HSBC's pre-motion legal arguments and also had to prepare an intensive, time-consuming rebuttal to HSBC's factual claims (Docs. 72, 73), along with related exhibits (Docs. 74–81).  *See* Singer Decl. ¶¶ 45–47.

Defendant served its motion for summary judgment on May 15, 2023 (Doc. 87).  Plaintiff then researched and drafted a response, which Plaintiff served on June 28, 2023.  The entire bundled motion, including Defendant's reply, was filed on August 9–10, 2023 (Docs. 94–98). Seeing that HSBC had raised a new legal argument in its reply, Plaintiff requested permission to file a surreply (Doc. 100), which the Court granted.  Plaintiff then researched and drafted the surreply, and filed it on August 31 (Doc. 101).  On February 16, the Court "emphatically" denied HSBC's motion for summary judgment *in its entirety*, holding that "this case easily presents a justiciable FCRA issue," and that "Rubin has presented more than sufficient evidence to defeat HSBCs motion for summary judgment."  (Doc. 102 at 6, 9).  *See* Singer Decl. ¶ 47.

### G. Settlement Negotiations

Plaintiff continually attempted to settle his claim with HSBC from the outset of this action, and at one point resorted to unilaterally negotiating against himself in an attempt to resolve this case without the need for more litigation.  Early on, the parties agreed to mediate their dispute (*See* Doc. 44). This mediation failed to resolve the case.  *See* Singer Decl. ¶ 48.

Defendant made an offer of judgment of $50,000 plus costs and attorney's fees post mediation on October 22, 2022. Plaintiff rejected the offer but continued to make repeated attempts to settle the case. *See* Singer Decl. ¶ 49. On July 28, 2022, Plaintiff transmitted to HSBC a letter

> in a further attempt to resolve this matter without the need for additional litigation. . . . Plaintiff has made several attempts to resolve this case in recent months, including an offer to attend mediation . . . which HSBC refused to attend.
>
> Plaintiff David Rubin hereby offers to resolve his claims against HSBC for a total sum of $230,000, inclusive of all attorney's fees and costs. Plaintiff makes this offer despite your statement that HSBC would refuse to respond to Plaintiff's prior settlement offer. Plaintiff's costs and attorney's fees are presently over $300,000 to date, so this offer represents not only a significant reduction in Plaintiff's demand but a willingness for counsel to drastically reduce their fees in order to get the case resolved at this point.
>
> *Should HSBC reject this offer and proceed with expert discovery and its planned summary judgment motion, this case will get exponentially more difficult to resolve and Plaintiff and counsel will no longer be willing to accept such a dramatic reduction in their demand. . . . We continue to unilaterally negotiate here in spite of HSBC's refusal to engage in settlement discussions because we firmly believe that this is the best chance to get the case resolved before fees and costs for both parties increase substantially.* Accordingly, we want to make it abundantly clear that a settlement anywhere close to this range will not be possible if HSBC does not prevail completely on its summary judgment motion."[4]

Defendant rejected the offer and instead offered Plaintiff $160,000 to settle the case, on September 9, 2022. Plaintiff counter-offered for $210,000. Defendant took the offer under advisement and proposed the parties request a 30-day extension for expert discovery. Plaintiff agreed, believing that this was a good-faith request for an extension in order to continue settlement negotiations, and that Defendant was not making the request for purposes of delay). The parties made the request (Doc. 58), which the Court granted. Defendant then informed Plaintiff on September 23, 2022, that HSBC would not move from its $160,000 offer. Plaintiff

---

[4] See Singer Decl. ¶ 50 (emphasis added).

was surprised, and concluded that HSBC never intended to continue its negotiations with Plaintiff as it informed the Court but rather simply wanted the extra time to complete expert discovery. *See* Singer Decl. ¶ 51.

Finally, after Defendant had lost its motion for summary judgment, and with the case scheduled to go to trial on May 20, Defendant made a second offer of judgment on April 26, 2024, the final day that the Court had set for the parties to inform the Court whether the case had settled or would go to trial. This offer included $250,000, plus costs and attorney's fees, an agreement that HSBC would not hold Plaintiff responsible for the disputed debt, and it would instruct the credit reporting agencies to remove the debt from Plaintiff's credit reports. (*See* Doc. 120). Plaintiff accepted the Offer of Judgment on May 10, 2024, and filed Notice of the accepted offer with the Court on May 23, 2024. A Judgment pursuant to the terms of the offer of judgment was entered on June 7, 2024. *See* Singer Decl. ¶ 52.

## III.    ARGUMENT

### A.   Plaintiff is Entitled to Costs and Attorney's Fees

In an FCRA matter, the plaintiff shall recover "the costs of the action together with reasonable attorney's fees" in "the case of any successful action to enforce liability." 15 U.S.C. §§ 1681n(a)(3) & o(a)(2). The Judgment entered in favor of Plaintiff establishes that Plaintiff successfully enforced liability against HSBC and is entitled to recover his attorney's fees and costs. Moreover, the Rule 68 Offer itself explicitly provides for the recovery of Plaintiff's and attorney's fees and costs.

### B.   Public Policy Supports the Award of Attorney's Fees

Congress enacted the FCRA to protect the accuracy, integrity, and privacy of an individual's personal and credit information. The FCRA requires consumer reporting agencies,

and the entities that report credit information to them, to ensure that a consumer's credit information is accurate and further mandates that when a consumer disputes the accuracy of certain credit information, the dispute is investigated to ensure the veracity of the information being reported by data furnishers, such as HSBC, to the consumer reporting agencies, and by extension by the consumer reporting agencies to potential lenders.

Both Congress and the courts have acknowledged that the objective of the fee shifting provision of the FCRA is to deputize private attorneys as "private attorneys general" and making it economically possible for them to vindicate consumer rights. *See Student Public Interest Research Group of New Jersey v. AT&T Bell Laboratories,* 842 F.2d 1436, 1449 (3d Cir. 1988); *Bryant v. TRW, Inc.*, 689 F.2d 72, 79-80 (6th Cir. 1982) (Congress intended the "private attorney general concept" to apply to the FCRA).

The fee-shifting provision of the FCRA is central to the FCRA's enforcement, which overwhelmingly relies on consumers and their counsel to act as private attorneys general. As one court noted concerning another federal consumer statute: "The value of an attorney's services is not only measured by the amount of the recovery to the plaintiff, but also the non-monetary benefit accruing to others, in this case, the public at large from this successful vindication of a national policy." *Fleet Inv. Co. v. Rogers*, 620 F.2d 792 (10th Cir 1980).

There is a great benefit to the public at large when consumers like Mr. Rubin enforce the FCRA.  Almost every adult American has a credit report, and those reports affect almost every aspect of a person's life, including obtaining a mortgage or other credit, getting a job, renting a residence, and getting insurance.  Everyone benefits from the heightened accuracy of credit reports.  In fact, our credit-based economy depends on such accuracy.

### C.  Plaintiff's Fee Request is Reasonable

#### 1.  <u>The Hourly Rates Requested by Plaintiff are Reasonable</u>

According to the U.S. Supreme Court, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The result of that calculation is called the lodestar; the lodestar is strongly presumed to yield a reasonable fee.  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

"[T]he reasonable hourly rate is the rate a paying client would be willing to pay." *Lilly v. City of New York*, 934 F.3d 222, 230 (2d Cir. 2019).  The rate must be "in line with ... prevailing rates in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation." *McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006).  The Court determines the prevailing rate based on evidentiary submissions by the parties, rates awarded in other cases, and its own familiarity with prevailing rates in the district.  *See Farbotko v. Clinton Cty. Of New York*, F.3d 204, 2011 (2d Cir 2005).

Mr. Singer has been practicing law for twenty years and has specialized in FCRA actions for over 13 years, has spoken at numerous conferences on the FCRA and is considered a leading attorney in the area.  **Singer Decl. ¶¶ 2–9.**  Mr. Singer seeks an hourly rate of $760.  Mr. Mallon has been exclusively representing consumers for the entirety of his 24 years of practice, has specialized in FCRA actions for the past 19 years of his career, has spoken at numerous conferences on the FCRA and has a number of published decisions under the act in the SDNY and EDNY.  Mallon Decl. ¶¶ 4–9.  He seeks an hourly rate of $795.  **Mallon Decl. ¶ 10.**  Mr. Sola has been an attorney for nearly 40 years and is considered one of the nation's pre-eminent

FCRA attorneys.  He has been handling FCRA cases since 1997 and has been lead trial counsel for several of the largest FCRA verdicts in history.  Sola Decl. ¶ 15–33.  Mr. Sola seeks an hourly rate of $1185.

These rates are supported by the declarations of expert witnesses familiar with the prevailing hourly rates in the Eastern District of New York and supporting affidavits of attorneys familiar with their work.  Mr. Mallon has been approved at higher hourly rates than those requested here.  Mallon Decl. ¶ 11.  Mr. Singer has been paid $725/hour by actual clients, which is the best proof of "the rate a paying client would be willing to pay" and has been awarded $575 in the SDNY in 2020  Singer Decl. ¶ 21.

In support of the hourly rates charged by Plaintiff's counsel, Plaintiff has provided the expert declaration of expert of John D. O'Connor, Esq, analyzing the hourly rates sought by Plaintiff for his counsel in this case and finding that those rates are at or below the appropriate rates for attorneys with comparable experience within the Eastern District of New York forum. *See* Singer Decl. at Exhibit 2.  Mr. Mallon has also provided an expert report of Abraham Reich, Esq., a partner at Fox Rothschild, in support of his hourly rates.  Mr. Reich has opined that Mr. Mallon's background supports rates in the $1,025–$1,065 range for the New York market. Mallon Decl. at Exhibit A.

The Second Circuit has instructed District Courts that "in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson* factors. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir.

1974).  The twelve *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

### a.   The Novelty and Difficulty of the Questions

What appeared at first to be a typical fraud/identity theft action became more complex as the case proceeded and as Defendant raised a number of novel and difficult legal questions as part of its defense.  Defendant argued in its motion for summary judgment that the question underlying this action was actually a legal one instead of a factual one, and thus not subject to an FCRA claim.  This topic has been the subject of much FRCA litigation in the last few years and hotly debated.  In fact the Second Circuit issued an important decision on the subject during the pendency of this action in *Mader v. Experian Information Solutions, Inc.*, 56 F.4th 264 (2d Cir. 2023).  Furthermore, after Plaintiff served his opposition a new Second Circuit decision came down with a critical decision on the topic, *Sessa v. Trans Union*, LLC, 74 F.4th 38 (2d Cir. 2023).  Defendant relied heavily on *Sessa* in its reply brief, which then necessitated a sur-reply by Plaintiff to address the new standard adopted by the Second Circuit in *Sessa*.

Defendant's summary judgment motion also argued that this Court should rule that consumers who are victims of fraud or identity theft should not be able to bring those claims under the FCRA without first raising them in state court—a completely novel argument it claimed was supported by a recent concurring opinion from the Court of Appeals for the Eleventh Circuit.  Had Defendant's argument prevailed it would have established groundbreaking precedent for the FCRA in favor of creditors and against consumers.

17

This case presented many novel and difficult issues besides the legal ones noted above. They include: the theft of Plaintiff's mail, spoofing of a telephone number, the fraudulent activation of an HSBC account, a criminal investigation by the police, the procedures for activating a credit account with HSBC, fraudulent charges made on the account at two different businesses, HSBC's policies and procedures regarding identity theft, the national credit reporting system, HSBC's role in the credit reporting system, HSBC's policies and procedures for investigation of consumer disputes, mortgage issues, credit scoring issues, Plaintiff's medical condition, two expert witnesses for plaintiff,  two expert witnesses on credit scoring for HSBC, numerous discovery disputes—some of which required resolution by the court, 11 depositions, and a motion for summary judgment.

> ### b.   The Level of Skill Required to Perform the Legal Services Properly

In this type of complex FCRA case, the plaintiff's lawyer must have special knowledge and skills to succeed. This includes knowledge of the types of credit and account information maintained by banks such as HSBC and how it can be obtained in discovery, knowledge of the credit reporting industry, understanding the practices and procedures of furnishers of information like HSBC, knowledge of the types of damages that result from inaccurate credit reporting and how to prove those damages, knowledge of the complex statutory scheme within the FCRA, knowledge of the large and varied body of case law concerning the FCRA, and the ability to understand the numerous specialized industry documents and the codes used in those documents.

Stated simply, FCRA litigation is highly specialized and not an area in which a typical lawyer can just file a complaint and expect to succeed.  Defendant believed that the case required a great deal of legal skill to adequately litigate it by hiring a Top 100 law firm, Morgan Lewis to

represent it.[5]  Plaintiff was represented by experienced FCRA lawyers and that was essential to the great result that was achieved.

### c.  The Case Was Taken on a Wholly Contingent Basis

The reasonableness of Plaintiff's fees is further supported by the fact that counsel took this case on a wholly contingent basis.  *See* Singer Decl. ¶ 11.  Plaintiff's counsel has not yet received any payment for their services.  Moreover, had HSBC prevailed on its summary judgment motion, counsel for Plaintiff would have received no fee for all their years of work.

As Judge Posner of the Seventh Circuit Court of Appeals has observed:

> A contingent fee must be *higher* than the fee for the same legal services as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders, but also for the loan of those services.  The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of a conventional loan.

Posner, *Economic Analysis of Law*, 534, 567 (4th ed. 1992) (emphasis added).

### d.  The Results Obtained

The result obtained here for Plaintiff was exceptional.  After the parties' mediation in late 2021, Defendant made a Rule 68 Offer to Plaintiff of $50,000 plus reasonable attorney's fees. After an additional two-and-a half years of litigation, and after prevailing on summary judgment, Plaintiff's counsel was able to obtain a Rule 68 Offer of ***five times that amount***, plus reasonable attorney's fees.  According to experienced FCRA attorneys, this result was in the top 1% of results for similar cases.  Mailman Decl. at 13.  The initial amount in dispute here on the fraudulent charges was under $2,000.  Plaintiff was able to obtain over one hundred and twenty-

---

[5] HSBC initially retained another large law firm to represent it here, Stroock & Stroock & Lavan, but later switched to Morgan Lewis after Stroock dissolved.

five times the amount in that dispute, plus the recovery of his attorney's fees spent litigating this action.

Furthermore, Plaintiff here obtained a public Judgment in his favor and against HSBC. That is no less than what he would have obtained had he prevailed at trial. He did not agree to a confidential settlement which is standard in such cases, and which would have resulted in the action being dismissed. Instead, he *won*. In addition, the opinion on summary judgment created positive case law for future consumers with FCRA claims. Thus, there can be no argument that that this was not an exceptional result for Plaintiff.

        e.   The Experience, Reputation and Abilities of the Attorneys

The attorneys Plaintiff retained in this action were not only experienced in FCRA litigation but experts and leaders in the field. Their abilities were evident in the extremely favorable summary judgment ruling obtained and the outstanding Rule 68 Offer of Judgment ultimately made by HSBC. Defendant retained one of the largest law firms in the world with over 2,200 attorneys to defend it, disputed liability throughout the entire action, and fought Plaintiff at every stage. Thus, the skill of Plaintiff's chosen counsel is evident in the result obtained if the face of the difficulties posed by Defendant in this case.

        f.   The Preclusion of Employment by the Attorneys Due to Acceptance of the Case

Because Plaintiff's counsel had to spend so much time litigating this matter over nearly four years, they were precluded from spending that time representing other clients in other matters. *See, e.g.*, Singer Decl. ¶ 17.

g.    The Nature and Length of the Professional Relationship with the Client

Finally, the nature of this work means that the attorneys had no prior relationship with Plaintiff and are extremely unlikely to receive any work from Plaintiff in the future.  All these factors fully support the rates sought by Plaintiff in this petition.

**2.    The Hours Expended by Plaintiff's Counsel were Entirely Reasonable and Necessary for the Prosecution of this Action**

The attorneys, paralegals, and staff who represented Plaintiff on this case all kept detailed, contemporaneous time records of tasks completed, the date the work was completed, and the nature of the work.  Singer Decl. ¶ 13; Mallon Decl. ¶ 12; Sola Decl. ¶ 2.  Each of the attorneys exercised discretion in their billing and removed charges from their billing records which they did not feel were completely necessary for the prosecution of this action.  Singer Decl. ¶ 15; Mallon Decl. ¶ 12; Sola Decl. ¶ 3.  The number of hours expended by Plaintiff's counsel is this case are a direct result of the Defendant's decision to obstruct, delay, file meritless motions, and not make a good faith attempt to settle the case until the eve of trial.

When HSBC initially produced documents in this case it refused to produce the most critical documents in the action—the ACDV's—which are the dispute forms between HSBC and the credit reporting agencies that showed HSBC's refusal to remove the disputed charge from Plaintiff's credit reports.  *See* Singer Decl, ¶ 30.  HSBC also refused to provide its policies and procedures for investigating consumer disputes, necessitating needless meet and confer sessions between counsel to obtain documents that were clearly relevant and discoverable.  *Id.*

Defendant also did all it could to obstruct Plaintiff from deposing its witnesses, as described above, requiring a motion to compel, which resulted in Magistrate Bulsara admonishing Defendant for its unprofessional and obstructionist conduct.  *See* Singer Decl, ¶ 38.

HSBC insisted on deposing six persons affiliated with Plaintiff, two of which were

21

plainly irrelevant to Plaintiff's claims.  It insisted on seeking testimony from Plaintiff's physician he had been seeing for a prior brain injury even though Plaintiff made it clear he was only seeking "garden variety" emotional distress damages and would not introduce testimony from his physician to support his claims.  Defendant also insisted on deposing Plaintiff's father, even though Plaintiff informed Defendant that his father was elderly and in mental decline and would not be able to recall anything relevant to Plaintiff's claims.  Defendant nevertheless went forward with another totally needless deposition.  The clear purpose of taking these wholly unnecessary depositions was to make this case more expensive and difficult for Plaintiff to prosecute.  *See* Singer Decl. ¶¶ 40–42.

The largest unnecessary expense for both parties in this action was Defendant's meritless motion for summary judgment.  A review of the Court's (now published) decision reveals that the motion never had any merit.  Defendant's argument that whether the subject charges were fraudulent was actually a "legal" and not a "factual" issue was not supported by case law and should never have been asserted yet was time-consuming to rebut.  As was its argument that Plaintiff was first required to bring a "declaratory judgment" state court action as a pre-requisite to this case, which this Court "emphatically rejected."  *See* Singer Decl, ¶¶ 45–47.

Likewise was Defendant's argument that its investigation was "reasonable" as a matter of law, when the record revealed that Defendant had not conducted *any* investigation in response to the disputes it received from the relevant credit reporting agencies.  That argument was also soundly rejected by the Court.  Thus, the entire motion served no actual purpose other than to make the case more difficult to prosecute, to delay Plaintiff's eventual recovery, and make the case exponentially more expensive for both parties.  *See* Singer Decl, ¶¶ 45–47.

After an unsuccessful mediation, Plaintiff continued to make every attempt to resolve the case before the litigation became needlessly prolonged.  Even after Defendant ceased negotiations, Plaintiff relentlessly tried to get the case resolved, even bidding against himself.  Accordingly, the bulk of this litigation, including all expert depositions, Plaintiff's Motion to Compel, Defendant's unsuccessful motion to seal documents, and Defendant's motion for summary judgment along with everything that proceeded after July 28, 2022 could have been avoided had Defendant accepted Plaintiff's offer on that date.  To be sure Defendant had every right to reject that offer and litigate this case to the maximum extent.  However, any argument at this point that the hours Plaintiff's attorneys put into this case were excessive is akin to the criminal defendant who murders his parents and then has the audacity to seek mercy from the Court because he is an orphan.  *See* Singer Decl, ¶¶ 48–52.

## IV.   CONCLUSION

For all of the reasons set forth above, Plaintiff's Motion for an Award of Attorneys' Fees and should be granted.  Plaintiff respectfully requests that he be awarded attorneys' fees in the amount of $728,998, taxable costs in the amount of $5,565 and non-taxable expenses in the amount of $15,450.

By: /s/ Adam G. Singer
Adam G. Singer
**Law Office of Adam G. Singer, PLLC**
One Grand Central Place
60 E. 42nd Street, Suite 4600
T: 212.842.2428
E: asinger@adamsingerlaw.com
*Counsel for Plaintiff David Rubin*

/s/ Kevin Mallon
Kevin Mallon
**Mallon Consumer Law Group, PLLC**
One Liberty Plaza, Suite 2301
New York, NY 10006
T: 917.734.6815
E: kmallon@consumerlawfirm.com
*Counsel for Plaintiff David Rubin*

/s/ Robert S. Sola
Robert S. Sola
**ROBERT S. SOLA, P.C.**
1500 SW First Avenue, Suite 800
Portland, OR 97201
T: (503) 295-6880
E: rssola@msn.com
*Counsel for Plaintiff David Rubin*