UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DAVID RUBIN

          *Plaintiff*,

-against-

HSBC BANK USA, NA, EQUIFAX INFORMATION SERVICES LLC, and EXPERIAN INFORMATION SOLUTIONS, INC.,

          *Defendants*.

1:20-cv-04566-FB-SJB

**DECLARATION OF ADAM G. SINGER IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

I, Adam G. Singer, declare as follows:

1. I am one of the attorneys principally responsible for representing David Rubin in this lawsuit.

2. I have been practicing law since 2004, from approximately one year after my graduation from the University of Pennsylvania Law School with a J.D., *cum laude* in 2003. (I earned my Bachelor of Arts, *summa cum laude*, from Washington University in St. Louis.) I am admitted to practice in the state courts of New York, and the United States District Courts for the Northern, Southern, Eastern, and Western Districts of New York as well as the Second Circuit Court of Appeals. I began my career (prior to admission to New York State in June 2004) in service as a full-time law clerk to the Honorable Sidney H. Stein, U.S.D.J. for the S.D.N.Y. from August 2003 to August 2004. I then worked as an associate attorney for Skadden Arps Slate Meagher & Flom LLP from 2004 – 2006 and then as an associate attorney at Akin Gump Strauss Hauer & Feld LLP from 2007 – 2009. From 2009 to 2011, I worked at the Salloway Law Group. In 2011, I began a solo practice which included my first case

1

representing a consumer being harmed by credit report errors.

3. In 2015, building upon my success as a sole proprietor, I founded the Law Office of Adam G. Singer, PLLC which has focused to this day almost entirely representing consumers harmed by credit report errors, especially on cases arising pursuant to the Fair Credit Reporting Act (federal and New York state statutes). In recent years, my firm has adopted the trade name, and is often known as, the Credit Report Law Group. In my practice, almost all of my cases involve representing individuals – typically on contingency and advancing costs out of my own firm's funds – against some of the largest financial institutions and credit reporting agencies. Typically, those defendants choose large international law firms to represent them. This case was no different, with Defendants having been represented by Strook & Strook & Lavan LLP (since dissolved) and Morgan Lewis & Bockius LLC (Defendant HSBC), Jones Day (Defendant Experian), and Seyfarth Shaw LLP (Defendant Equifax).

4. Based on a review of PACER records, I have served as counsel in approximately 119 Fair Credit Reporting Act cases, including single-plaintiff matters and multi-plaintiff matters, many of which were multi-defendant actions.

5. I have been admitted *pro hac vice* in Maryland.

6. As a result of my experience in FCRA litigation, I have been selected as a speaker at numerous CLEs on Fair Credit Reporting Act litigation, including at national conferences with the National Association of Consumer Advocates (NACA) in 2017, 2019, and 2023 at NACA's national Bi- Annual Fair Credit Reporting Act Conference and was invited to speak at other NACA events as well. In addition, I have co-hosted a NACA webinar for attorneys about FCRA practice and served on NACA's Education Committee and

Conference Planning Committee for its FCRA Conference. Finally, I have been an invited speaker on multiple occasions at the U.S. Military Academy at West Point. At West Point, I presented to its JAG Corp guidance for servicemen and servicewomen on how to address credit reporting and related identity theft problems. I have presented to an international credit counseling organization about identifying and remedying the basics of credit report errors. I also have been invited to give other presentations.

7. I am a member of the National Associate of Consumer Advocates (NACA) and currently serve on its Membership Committee. I also am a member of the Federal Bar Council which, among many other things, publishes the Second Circuit Redbook. In the past, I served on the NACA Education Committee and the NYC Bar Association's Consumer Affairs Committee.

8. I have been featured in national media publications such as the New York Times, Crain's, CBS News, Newsweek, and Market Scale as well as local publications. I am a regular contributor to Forbes.com regarding credit reporting issues with several articles about the intersection of credit reports and identity theft.

9. I have been selected to the SuperLawyers list for five years in a row and was previously selected to its Rising Stars list. Avvo lists my rating as a 10.0 and shows 59 reviews, each of which are 5-star reviews.

10. Plaintiff first contacted my firm on or about May 20, 2020. Plaintiff signed an engagement letter with a contingency fee structure with this firm on or about July 1, 2020.

11. The hourly rate charged by my firm in this matter currently for 2024 is $760 for my time, $445/hour for associate attorney time, $235/hour for senior paralegal time, and $125/hour for case clerk time (most of which was performed by the senior paralegal).

Consistent with the law, Plaintiff's application is for the firm's current rates.[1]

12. In the present case, I served as co-lead counsel and was responsible, along with my co-counsel, for all aspects of litigation.

13. As set forth in the time records attached to this Declaration as **Exhibit 1**, the following individuals, in addition to the undersigned, performed billable work in this case: attorneys Richard Kraus and Noah Kane as well as paralegal Thomas Guarino. Their declarations are annexed hereto as **Exhibit 2**. My firm incurred fees in the amount of $533,796. In addition, my firm advanced costs and expenses totaling $21,015, not including expenses related to this petition, not all of which are compensable in a bill of costs. A Bill of Costs is being filed for $5,565; that amount is included with the above-referenced $21,015. All of the services performed in connection with this case were reasonably necessary for representation of Plaintiff.

14. This rate is based on the regular current rates charged to clients who retain my firm's services by paying in advance. Attached as **Exhibit 3** are redacted copies of an engagement letters from 2023 by clients of the firm that paid out of pocket and in advance (not contingency with its associated risks of non-payment) for my services at a rate of $725/hour. I represent(ed) other clients on similar terms this year, also at a rate of $725/hour.

15. I exercised billing discretion. That included listing over 200 billing entries at a billable amount or rate of $0.00, my billing system's equivalent of "no charge."

16. In addition, per the terms of the accepted Offer of Judgment which provided that Plaintiff may seek fees and costs through the date of the offer, this firm is not able to submit fees for the substantial effort required to prepare this petition and associated materials,

---

[1] There are a small number of billing entries for prior employees, and those rates set forth reflect the historical rates for those billers.

4

necessarily incurred after the date of that offer.

17. The work on this case prevented and delayed my firm from taking on other work.

18. I strive for excellence in every case on behalf of every client. Annexed hereto as **Exhibit 4** are a selection of public client reviews that I believe speak for themselves as to my reputation and the quality of representation I have provided my clients and aim to provide to individuals in the market for legal services who consider retaining my law firm at our regular rates (contingency or out-of-pocket), notwithstanding their choice to retain other counsel.

19. A declaration of attorney Mark D. Mailman, annexed hereto as **Exhibit 5**, sets forth, among other things, his opinion as to the fees charged, rates used, and results obtained in this matter by the undersigned's firm as well as the undersigned's reputation as an attorney and experience in particular handling Fair Credit Reporting Act litigation.

20. A declaration of attorney John O'Connor, annexed as a separate document to this fee application, sets forth, among other things, his expert opinion as to the fees charged, rates used, and results obtained in this matter.

21. Two courts in the Southern District of New York approved my then-current rate for work in 2020 in Fair Credit Reporting Act litigation at $575/hour. *Lucas v. Accutrace, Inc.*, 7:2018-cv-09059 (S.D.N.Y.). and *Sanders V. Makespace Labs, Inc.*, 1:18cv10016 (S.D.N.Y.).

22. This matter on behalf of Plaintiff David Rubin was the most contentious case I have litigated since I founded my firm in 2015. From early on in Mr. Rubin's case, HSBC seemed bent on obstruction including delaying – or if possible denying – fair relief for Plaintiff. That pattern continued throughout the case. Eventually, I elected to invite Kevin

5

Mallon to join in my firm's representation of Plaintiff as I believed Mr. Rubin would benefit from additional experienced FCRA counsel to share in what I expected would be a heavy workload to secure a fair result for my client in the face of HSBC's clear intent to deny the same. After Plaintiff defeated HSBC's motion for summary judgment, Mr. Mallon and I decided that Plaintiff would further benefit from inviting counsel with extensive FCRA trial experience to join the representation as we prepared for trial and Robert Sola, one of the preeminent FCRA trial attorneys, entered his notice of appearance on March 18, 2024. HSBC's obstructionism was noted by Magistrate Judge Bulsara as further referenced below. The incidents set forth in this motion, including in this declaration, represent but a sampling of the unfortunate tactics that HSBC elected to direct at Plaintiff, a victim of ID theft who has now found some measure of relief after over three years of vexing litigation. Along the way, HSBC taxed Plaintiff, his counsel, the Court system, and caused substantial delay in the administration of justice. After all this, Defendant offered to have a judgment entered against it including a reversal of the single line-item charge in question.

23. This Fair Credit Reporting Act ("FCRA") case arose from Plaintiff's allegations of fraud, where he claimed an identity thief stole his HSBC credit card before he ever received it and used it to run up a charge of $1,850.85 at BJ's Wholesale, Inc. and an additional failed attempted to make charges at a nearby Target. HSBC, realizing that this activity was indicative of fraud, blocked the used of the card at Target and sent a fraud alert to Plaintiff. Plaintiff immediately notified HSBC that he had never received the card and had not made the BJ's charge or attempted to make the Target charge. HSBC responded on October 18 that it would cancel the card. HSBC sent Plaintiff a card statement for the period October 4 to November 3, 2019, crediting Plaintiff $1,850.85.

6

24. Subsequently, however, HSBC denied Plaintiff's fraud claim and began furnishing the fraudulent $1,850.85 in charges to the credit reporting agencies. Plaintiff disputed the false charge with HSBC and also reported the matter to the police and to the Postal Service. He also disputed the false account with the credit reporting agencies, who informed HSBC of the disputes, but HSBC failed to investigate those disputes and at all times refused to remove the subject account from Plaintiff's credit reports.

25. Issues and facts in this case, include: the theft of plaintiff's identity, the theft of plaintiff's mail, spoofing of a telephone number, the fraudulent activation of an HSBC account, a criminal investigation by the police, the procedures for activating a credit account with HSBC, fraudulent charges made on the account at two different businesses, HSBC's policies and procedures regarding identity theft, numerous interactions and communications between plaintiff and HSBC and between Plaintiff and the credit bureaus, the national credit reporting system, HSBC's role in the credit reporting system, HSBC's policies and procedures for investigation of consumer disputes, obtaining and understanding the documents produced by HSBC, obtaining and understanding the credit reporting agency documents related to the fraudulent HSBC account, mortgage issues, credit scoring issues, plaintiff's medical condition, two expert witnesses for plaintiff, two expert witnesses for HSBC, the requirements of the Fair Credit Reporting Act applicable to HSBC, the case law interpreting the requirements of the Fair Credit Reporting Act applicable to HSBC, numerous discovery disputes – some of which required resolution by the court, at least eleven depositions, and a motion for summary judgment.

In this type of complex FCRA case, the plaintiff's lawyer must have special knowledge and skills to succeed. This includes knowledge of the types of credit and account information

7

maintained by banks such as HSBC and how it can be obtained in discovery, knowledge of the credit reporting industry, understanding the practices and procedures of furnishers of information like HSBC, knowledge of the types of damages that result from inaccurate credit reporting and how to prove those damages, knowledge of the complex statutory scheme within the FCRA, knowledge of the large and varied body of case law concerning the FCRA, and the ability to understand the numerous specialized industry documents and the codes used in those documents.

26. Plaintiff filed the instant suit September 25, 2020. Unfortunately, HSBC's conduct did not improve once litigation began. Instead, HSBC engaged in a pattern of obstructionism. Although Plaintiff served HSBC with the complaint on October 2, 2020, HSBC failed to respond to the complaint by the deadline of October 23, and did not even move for an extension until October 26, whereupon HSBC requested an additional 45 days to respond, claiming it "require[d] additional time to investigate Plaintiff's claims," even though, of course, HSBC had been statutorily required to investigate Plaintiff's claims upon being informed of his disputes by the credit bureaus.

27. When it did finally file its Answer, HSBC offered essentially no substantive information, repeating the phrase "HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations" forty-four separate times. This was an especially egregious response, since the HSBC had been required, under the Fair Credit Reporting Act, to conduct its own investigation once it had been informed of Plaintiff's disputes by the credit bureaus. For HSBC to claim, after Plaintiff's multiple disputes, to simply have no information as to the validity of those disputes, was tantamount to an admission of liability.

28. Written discovery commenced after all parties were joined, with the parties producing nearly 700 pages of combined documents, multiple lengthy spreadsheets, multiple

audio recordings, and in addition, interrogatory responses and responses to requests for admission. A discovery plan was approved by the Court on February 12, 2021. Following a status conference on June 10, the Court referred the case to mediation. HSBC's co-defendants settled quickly, but settlement negotiations with HSBC were hampered because HSBC did not produce any documents or other discovery, even informally, until a protective order was entered on July 7, 2021.

29. Plaintiff's counsel served counsel for HSBC with Plaintiff's first set of document requests and interrogatories; and a notice of deposition under Fed. R. Civ. Pro. 30(b)(6) as well as notices of deposition under Rule 30(b)(1). On July 28, 2021, HSBC moved, jointly with Plaintiff, to stay discovery deadlines pending the completion of an attempted mediation and to extend the deadline to complete the mediation. The Court extended the mediation but refused to stay discovery.

30. On July 30, 2021, HSBC produced a mere 54 pages of documents informally, but refused to produce any ACDVs, the main record of its communications with the credit bureaus about Plaintiff's disputes. HSBC also failed to provide copies of its policies and procedures for investigating disputes, forcing Plaintiff's counsel to spend time meeting and conferring with counsel for HSBC about these missing documents.

31. The parties then moved on August 8, 2021 to extend discovery, to which the Court agreed, extending both discovery and the mediation to October 29. The parties then requested, on October 8, 2021, another extension for discovery, to which the Court agreed, extending the deadline to December 13, 2021. HSBC moved for a further extension for fact discovery on December 13. The parties jointly moved on May 16, 2022, for an extension for expert discovery; Plaintiff moved for another expert discovery extension on July 18, and the

9

parties jointly moved for another expert discovery extension on September 12. While most of these motions for extensions were technically from both parties, they were necessitated principally by HSBC's delay in producing evidence, and Plaintiff agreed to them primarily in the interest of collegiality. HSBC, however, often did not reciprocate these efforts to cooperate in discovery.

32. Plaintiff's counsel deposed, in total, five witnesses: HSBC's corporate representative Nancy Taylor, HSBC's fraud investigator George Mossios, HSBC's erstwhile senior manager of contact flow Brian DeFontes, and HSBC's experts, Lance Watson and John Ulzheimer.

33. On August 24, 2021, Plaintiff served a notice of deposition on HSBC pursuant to Fed. R. Civ. Pro. 30(b)(6), requiring HSBC to produce a corporate representative able to answer questions about the basis for HSBC's conclusion that the telephone call to activate the credit card had come from Plaintiff's telephone number, on which conclusion HSBC's rejection of Plaintiff's disputes had depended.

34. HSBC initially produced two witnesses: HSBC's corporate representative Nancy Taylor, HSBC's fraud investigator George Mossios. After those two witnesses were unable to answer some basic questions about the nature of HSBC's investigations of Plaintiff's dispute, Plaintiff served a notice of deposition on HSBC pursuant to Fed. R. Civ. Pro. 30(b)(6), on August 24, 2001, requiring HSBC to produce a corporate representative to answer those additional questions.

35. Nancy Taylor was unable to answer basic questions about what technology HSBC used to determine the number from which the card-activation call had come, whether HSBC used any kind of anti-spoofing software to detect falsified numbers, or whether HSBC

had any policies or procedures to detect falsified call data. HSBC's witness repeatedly stated that she was "not aware" in response to such questions.

36.    George Mossios was also unable to answer questions about how the telephone number had been verified or what if any policies HSBC had to prevent or discover the falsification of incoming telephone numbers. This did not prevent him from testifying that this purported telephone number match had been "extremely significant" in making his determination, and that it justified disregarding all the other evidence Plaintiff had presented.

37.    To obtain testimony from witnesses actually able to answer these questions, Plaintiff also served a deposition notice for HSBC employee, Brian DeFontes, who had been HSBC's senior manager of contact flow and, in that capacity, had been responsible for HSBC's Interactive Voice Response system. Both depositions were initially scheduled for December 7, 2021, and the second 30(b)(6) deposition also contained a request to meet and confer about the deposition topics. Defendant refused to meet and confer with Plaintiff about the depositions, or even let the Plaintiff know if they intended to actually produce any witnesses. On the night before the depositions were scheduled to go forward, Defendant e-mailed plaintiff at 10:36 pm to notify them that it would not be producing any witnesses on the following day, serving formal objections to the notices at that late hour.

38.    Plaintiff was thus forced to file an otherwise unnecessary motion to compel production of the relevant witnesses. Defendant argued that it was not obligated to produce a certain employee, Brian Defontes, pursuant to FRCP 30 because he was not a "managing agent," thus forcing Plaintiff to locate and subpoena the witness pursuant to FRCP 45. Once Plaintiff served the witness with the subpoena at his home address, Defendant emailed Plaintiff to complain that this "was not well received by either him [DeFontes] or our in-house

11

legal contact who now is having us represent Mr. DeFontes. Please direct all future communications regarding Mr. DeFontes to us."[2] This conduct was not well received by Magistrate Bulsara.

> [Y]our [counsel for HSBC's] insistence of the Rule 45 subpoena process as opposed to the deposition notice process is just obstruction, okay? If he's [DeFontes] is an [HSBC] employee who you're going to represent, your colleague's letter opposing the deposition on that technical ground is something I've never heard of from a law firm representing a corporation and individual employees, okay? I will tell you, it's unbecoming and I'm not pleased to see that kind of behavior at all….
>
> Okay, Mr. Frontino [counsel for HSBC], you mistake common sense and decency and obstruction. You've engaged in the latter at the expense of the former…. So your behavior here is frankly uncooperative to say the least…. It's unprofessional and unbecoming….

39. Plaintiff additionally deposed HSBC expert witnesses, John Ulzheimer and Lance Watson. All of Plaintiff's depositions were necessary in successfully opposing HSBC's motion for summary judgment.

40. HSBC conducted six depositions, all of which were defended by Plaintiff's counsel: Plaintiff, his wife Heske Van Doornen, his friend Greg Kessler, his mother Christina Rubin, his father Allen Rubin, and his physician, Dr. Prin Amorapanth.

41. Two of those witnesses had no information relevant to Plaintiff's claims, but Defendant insisted on deposing them anyway, even requesting a sixty-day discovery extension (Doc. 48) to do so. First, HSBC insisted on deposing Plaintiff's physician, Dr. Prin Amorapanth, even though Plaintiff had already notified HSBC via counsel that Plaintiff would be seeking only "garden variety" emotional distress damages and, as such, medical evidence would not be material, and Plaintiff would not be calling his physician or another medical expert. Counsel for HSBC stated that if Plaintiff stipulated that he "will not claim he is seeing a mental health or other medical professional for any alleged emotional distress damages, we

---

[2] Email from Brian Frontino, counsel for HSBC, to Adam Singer, counsel for Plaintiff, Jan. 3, 2022, 11:08 am.

will confer with our client about foregoing this discovery."[3]  Plaintiff agreed to the proposed stipulation, but HSBC insisted on deposing Dr. Amorapanth anyway.  The ensuing deposition stretched over three sessions, May 23, June 14, and June 20, 2022, and revealed no information relevant to the Plaintiff's claims.

42.    Second, HSBC insisted on deposing Plaintiff's father, Allen Rubin, even though Plaintiff's counsel had notified HSBC that Allen Rubin was an elderly man in mental decline whom Plaintiff would not call.  Nevertheless, HSBC insisted on deposing him on March 30, 2022.  Plaintiff's counsel also had to defend this unnecessary deposition.

43.    While this case was pending, the Supreme Court held, in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), that for a plaintiff to have standing under the FCRA, the disputed information had to have been published to some third party and at least suggested that a plaintiff would have to show an actual credit denial or other concrete harm.  It thus became important for additional reasons for Plaintiff's counsel to obtain evidence from the various third parties to which the credit bureaus had published the false information that HSBC had furnished.

44.    Plaintiff's counsel thus served subpoenas on American Express, Blue Ridge Bank, Capital One, Chase Bank, Cross River Bank, Data Facts, Farm Credit East, Finwise, LendingPoint, Marlette, and the Small Business Administration in order to prove the harm Plaintiff suffered as a result of Defendant's unlawful conduct.  None of these institutions responded promptly, forcing Plaintiff's counsel to follow up, sometimes at length, with these institutions by calling and emailing their respective in-house legal departments or subpoena compliance departments.

---

[3] Email from Brian Frontino, counsel for HSBC, to Adam Singer, counsel for Plaintiff, Jan. 31, 2022, 11:07 am.

45. On December 21, 2022, HSBC filed a letter-motion requesting a pre-motion conference for a motion for summary judgment (Doc. 61), along with an accompanying statement of material facts (Doc. 62), and a motion for leave to file documents relevant to its motion under seal (Doc. 63). The Court on January 4, 2023, rejected HSBC's motion to seal, finding it "substantially meritless," but allowed HSBC to file an amended motion to seal, *which was also rejected by the Court,* finding that "HSBC filed a motion that failed to even address the Court's prior order, which is even more unfortunate," that "the Court's [prior] order pointed this out and HSBC simply ignored it," and further stating that HSBC's decision "to file basically the same motion and ignore the Court's order is a grave concern." The Court also pointed out that HSBC had failed to narrowly tailor its request to seal, holding that HSBC's request was not "supported by any case law, particularly the Second Circuit's most recent case law." In dealing with specific examples of what HSBC sought to seal, the Court went on that HSBC's request "frankly, boggles the mind," that "[n]o case law supports such sealing," and that "it's just laughable to assert that they're entitled to sealing." The Court also pointed out that "neither of those authorities" cited by HSBC in support of its motion were "remotely relevant." The Court summarized HSBC's motion as "borderline frivolous" and "utterly meritless" and ordered all the relevant documents unsealed.[4]

46. Plaintiff's counsel had to respond to HSBC's pre-motion legal arguments and prepare a response while also assembling the relevant facts to rebut HSBC's factual claims, which Plaintiff filed on February 10, 2023 (Docs. 72, 73), along with related exhibits (Docs. 74–81).

47. HSBC served its motion for summary judgment on May 15, 2023 (Doc. 87).

---

[4] Transcript of Status Conference Hearing before the Honorable Sanket J. Bulsara, March 17, 2023 (Dkt. 90).

Plaintiff's counsel then researched and drafted a response, which Plaintiff served on June 28, 2023. The entire bundled motion, including HSBC's reply, was filed on August 9 –10, 2023 (Docs. 94–98). Seeing that HSBC had raised a new legal argument in its reply, Plaintiff's counsel requested, on August 15, permission to file a surreply (Doc. 100), which the Court granted. Plaintiff's counsel then researched and drafted the surreply, and filed it on August 31 (Doc. 101). On February 16, 2024, in a decision since-published as *Rubin v. HSBC Bank USA, NA*, No. 20-CV-4566 (FB), 2024 WL 649916 (E.D.N.Y. Feb. 16, 2024), the Court denied HSBC's motion for summary judgment in its entirety, holding that "this case easily presents a justiciable FCRA issue," that "Rubin has presented more than sufficient evidence to defeat HSBCs motion for summary judgment." (Doc. 102 at 6, 9).

48. Plaintiff's counsel continually attempted to settle with HSBC from the outset of this action, and at one point resorted to unilaterally negotiating against himself in an attempt to resolve this case without the need for excessive litigation. Early on, the parties agreed to mediate their dispute (See Doc. 44). This mediation failed to resolve the case.

49. Counsel for HSBC transmitted to Plaintiff's counsel an offer of judgment of $50,000 plus costs and attorney's fees post mediation on October 22, 2022. Plaintiff rejected the offer but continued to negotiate, however, making repeated attempts to settle the case.

50. On July 28, 2022, Plaintiff's counsel transmitted to HSBC a letter "in a further attempt to resolve th[e] matter without the need for additional litigation. . . . Plaintiff ha[d] made several attempts to resolve this case in recent months, including and offer to attend mediation . . . which HSBC refused to attend."[5] A copy of this letter is annexed hereto as **Exhibit 6**. In this letter, Plaintiff "offer[ed] to resolve his claims against HSBC for a total sum

---

[5] Letter from Adam G. Singer, counsel for Plaintiff, to Brian Frontino, counsel for HSBC, July 28, 2022.

15

of $230,000, inclusive of all attorney's fees and costs. Plaintiff ma[de] this offer despite [HSBC's] statement that HSBC would refuse to respond to Plaintiff's prior settlement offer." Plaintiff further pointed out that his "costs and attorney's fees [we]re presently [as of July 2022] over $300,000 to date, so this offer represent[ed] not only a significant reduction in Plaintiff's demand but a willingness for [Plaintiff's] counsel to drastically reduce their fees in order to get the case resolved . . . ." Plaintiff then went on to note that "[s]hould HSBC reject this offer and proceed with expert discovery and its planned summary judgment motion, this case will get exponentially more difficult to resolve and Plaintiff and counsel will no longer be willing to accept such a dramatic reduction in their demand . . . ." Plaintiff then concluded by averring that he was "continu[ing] to unilaterally negotiate here in spite of HSBC's refusal to engage in settlement discussions . . . before fees and costs for both parties increase substantially," but "a settlement anywhere close to this range will not be possible if HSBC does not prevail completely on its summary judgment motion."

51.    HSBC rejected the offer and instead offered Plaintiff $160,000 to settle the case, on September 9, 2022. Plaintiff counter-offered for $210,000.[6] HSBC took the offer under advisement and proposed the parties request a 30-day extension for expert discovery.[7] Plaintiff agreed, believing that this was a good-faith request for an extension in order to consider settlement negotiations, and the parties made the request (Doc. 58), which the Court granted. Counsel for HSBC then informed Plaintiff's counsel on September 23, 2022, that HSBC would not move from its offer of $160,000.[8] Accordingly, the likely conclusion is that HSBC never intended to continue its negotiations with Plaintiff as it informed the Court but

---

[6] *See* email from Adam Singer, counsel for Plaintiff, to Brian Frontino, counsel for HSBC, Sept. 9, 2022, at 1:02 pm.
[7] Email from Brian Frontino, counsel for HSBC, to Adam Singer, counsel for Plaintiff, Sept. 9, 2022, at 1:17 pm.
[8] Email from Brian Frontino, counsel for HSBC, to Adam Singer, counsel for Plaintiff, Sept. 23, 2022, at 9:52 pm.

rather simply wanted the extra time to complete expert discovery.

52.     Finally, after HSBC had lost its motion for summary judgment, and with the case scheduled to go to trial on May 20, HSBC made a second offer of judgment on April 26, 2024, this time for $250,000 plus costs and attorney's fees, an agreement that it would not seek to hold Plaintiff responsible for the disputed debt and would instruct the credit reporting agencies to remove the debt from Plaintiff's credit reports.  (See Doc. 120).  Plaintiff accepted the Offer of Judgment on May 10, 2024 and filed Notice of the accepted offer with the Court on May 23, 2024.  The Amended Clerk's Judgment was entered on June 7, 2024.

53.     This result was "exceptional," likely within the top 1% of awards that an FCRA Plaintiff could expect. *Mailman Decl.* at 13.  The exceptional nature of the result was further enhanced by being public.  The fate of most FCRA resolutions remain forever hidden by confidentiality agreements, withholding valuable information from the public at large which is at risk of, and far too often is subjected to, defamatory information on credit and other consumer reports. *Id.*  This exceptional result is enhanced further by the fact that judgment was obtained in favor of Plaintiff and against HSBC without incurring the risks of trial by jury. *Id.*  Ultimately, this "David" prevailed his case against a much larger and fearsome opponent, delayed and as hard-fought as that victory was.

54.     I state the foregoing within a reasonable degree of certainty to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 21, 2024

By: /s/ Adam G. Singer<br>
Adam G. Singer<br>
**Law Office of Adam G. Singer, PLLC**<br>
One Grand Central Place

60 E. 42nd Street, Suite 4600
T: 212.842.2428
E: asinger@adamsingerlaw.com
*Counsel for Plaintiff David Rubin*

18